**ORIGINAL**

1  Timothy P. Dillon (CSB No. 123953)
   LAW OFFICES OF
2  TIMOTHY P. DILLON
   361 Forest Avenue, Suite 205
3  Laguna Beach, California 92651
   (949) 376-2800
4  (949) 376-2808  Facsimile
   timothy@dillonlaw.net
5
6  Attorneys for Plaintiffs
   Juan Rodriguez and Josefina Rodriguez
7
8
9
10            UNITED STATES DISTRICT COURT
11            CENTRAL DISTRICT OF CALIFORNIA
12                                        C V07-6780 CAS (AJWx)
13  JUAN RODRIGUEZ and JOSEFINA       Case No.
    RODRIGUEZ, individually, and on the
14  class of all others similarly situated,   **COMPLAINT**
15              Plaintiffs,            CLASS ACTION
16        v.                          1.  Violations of the Equal Credit
                                          Opportunity Act; 15 U.S.C. § 1691
17  WELLS FARGO BANK, N.A.,           2.  Violations of the Fair Housing
18              Defendant.                Act; 42 U.S.C. § 3601
                                      3.  Violations of the Civil Rights Act,
19                                        42 U.S.C. §1981; and
20                                    4.  Violations of the Civil Rights Act,
21                                        42 U.S.C. §1982.
22
23
24
25
26
27
28

1.    Jurisdiction is based on 28 U.S.C. section 1331 as an action arising under federal law.

2.    For their Complaint, Plaintiffs Juan Rodriguez and Josefina Rodriguez ("Plaintiffs") bring this class action against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") to redress racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. section 1691, *et seq.* ("ECOA"), the Fair Housing Act, 42 U.S.C. section 3601 *et seq.* ("FHA"), and the Civil Rights Act, 42 U.S.C. sections 1981 and 1982, on behalf of themselves and all others similarly situated.

## INTRODUCTION

3.    This action is based on the racially discriminatory mortgage lending practices of Wells Fargo. Through its development and implementation of mortgage pricing policies and procedures, Wells Fargo has engaged in both intentional and disparate impact discrimination against minorities. Wells Fargo does so by providing financial incentives to its authorized loan officers, mortgage brokers and correspondent lenders thereby encouraging them to make subjective decisions to increase interest rates and charge additional fees and costs to minority borrowers.

4.    With substantial financial incentives made available by Wells Fargo to motivate them, Wells Fargo's authorized loan officers, mortgage brokers and correspondent lenders are given the discretion and thereby are actually encouraged, to increase interest rates and charge additional fees to certain borrowers as set forth in this Complaint. These policies directly lead to minorities receiving home loans with higher interest rates and higher fees and costs than similarly situated non-minority borrowers. By design of Wells Fargo, loan pricing policy discriminates against minority borrowers.

5.    As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups protected under 42 U.S.C.

1

1  sections 1981, 1982, and 3604, and 15 U.S.C. section 1691.

2      6.      As set forth in more detail in the "Class Allegations" below, Plaintiffs
3  bring this action on behalf of all minorities (collectively referred to as the "Class"
4  or "Members of the Class") who have entered into residential mortgage loan
5  contracts that were financed or purchased by Wells Fargo, and who have been
6  subjected to racial discrimination as set forth in this Complaint.

7      7.      By this action, Plaintiffs and Members of the Class seek injunctive,
8  declaratory, and equitable relief and other remedies against Wells Fargo.

9                          JURISDICTION AND VENUE

10     8.      This Court has jurisdiction over this action in accordance with 28
11 U.S.C. section 1331 as a civil action arising under federal law.

12     9.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) because a
13 substantial part of the events giving rise to Plaintiffs' claim occurred within this
14 District.

15                                PARTIES

16     10.     Plaintiffs are, and at all times herein mentioned were, residents and
17 citizens of the state of California. At all times relevant, Plaintiffs Juan Rodriguez
18 and Josefina Rodriguez are Latinos and own the residence located at 947 West 80th
19 Street, Los Angeles, California, 90044.

20     11.     Wells Fargo is, and at all times relevant times, was, a national banking
21 corporation duly organized and existing under and by virtue of the laws of the state
22 of California and engaged in the business of banking, including the making of
23 loans as alleged in this Complaint, within the state of California and within this
24 judicial district.

25                              BACKGROUND

26 A.   History of Discrimination

27     12.     Racial discrimination in America's mortgage lending industry is long
28 established. As set forth in this Complaint, the unfortunate history of

2

1  discrimination continues to this day because of the discriminatory treatment of
2  minorities when obtaining mortgage loans from banks such as Wells Fargo.
3       13.    The Joint Center for Housing Studies at Harvard University
4  summarized the history of racial discrimination in mortgage lending in a study in
5  2005 called "The Dual Mortgage Market: The Persistence of Discrimination in
6  Mortgage Lending." This study concludes:

7              [i]n the immediate post-World War II period, racial
8              discrimination in mortgage lending was easy to spot.
9              From government-sponsored racial covenants in the
10             Federal Housing Administration (FHA) guidelines to the
11             redlining practices of private mortgage lenders and
12             financial institutions, minorities were denied access to
13             home mortgages in ways that severely limited their
14             ability to purchase a home. Today, mortgage lending
15             discrimination is more subtle. . . . [M]ore than three
16             decades after the enactment of national fair lending
17             legislation, minority consumers continue to have less-
18             than-equal access to loans at the best prices and on the
19             best terms that their credit history, income, and other
20             individual financial considerations merit.

21      14.    In 2004, concerned with potential racial discrimination in loan
22  pricing, and recognizing that racial or other types of discrimination can occur when
23  loan officers and mortgage brokers have latitude in setting interest rates, the
24  Federal Reserve Board began requiring lenders to also report information
25  concerning rates, points, and fees, charged to borrowers on high-cost loans.
26      15.    In 1989, Congress required lenders to begin disclosing information
27  about mortgage borrowers' race and ethnicity. The Federal Home Mortgage
28  Disclosure Act ("HMDA") requires mortgage lenders to report information about

3

1   the home loans they process each year. In 2005, lenders in this country reported

2   information on more than 30 million home loan applications as required by the

3   HMDA.

4        16.   For 2004, the HMDA data discloses profound loan pricing disparities

5   between Hispanic borrowers and non-Hispanic whites even after accounting for

6   borrowers' gender, income, property location, and loan amount. After accounting

7   for those differences in the 2004 HMDA data, Hispanic borrowers were still almost

8   twice as likely to receive a higher-rate of interest on their home loan as non-

9   Hispanic whites. (http://www.responsiblelending.org/pdfs/Testimony-

10   Ernst061306.pdf (last viewed October 11, 2007).) The Center for Responsible

11   Lending testified:

12          <u>Our findings were striking.</u> We found that race and

13          ethnicity—two factors that should play no role in pricing—

14          are significant predictors of whether a subprime loan falls

15          into the higher-rate portion of the market. <u>Race and</u>

16          <u>ethnicity remained significant predictors</u> even after we

17          accounted for the major factors that lenders list on rate

18          sheets to determine loan pricing.

19

20          In other words, even after controlling for legitimate loan

21          risk factors, including borrowers' credit score, loan-to-

22          value ratio, and ability to document income, race and

23          ethnicity matter. African American and Latino borrowers

24          continue to face a much greater likelihood of receiving the

25          most expensive subprime loans—even with the same loan

26          type and the same qualifications as their white

27          counterparts. <u>Across a variety of different loan types,</u>

28          <u>African American and Latino borrowers were commonly</u>

4

1    30% more likely to receive a high-rate loan than White
2    borrowers. (emphasis added).
3        17.    Indeed, a speech in 2006, the Vice-Chairman of the Federal Deposit
4    Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and
5    observed that that data "clearly indicated" that Hispanics are more likely to receive
6    high-cost home loans than are non-Hispanic whites. (http://www.fdic.gov/
7    news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed October
8    11, 2007).) Mr. Gruenberg concluded:
9        A number of studies have been conducted using new
10       Home Mortgage Disclosure Act ("HMDA") data that have
11       revealed significant disparities in the incidence of higher
12       priced loans across racial and ethnic groups. . . .
13
14       Based on 2004 data, it clearly indicated that certain
15       minority groups, including Hispanic whites and African
16       Americans, are more likely to receive high-priced
17       mortgage loans than non-minority groups. The study
18       attempted to explain these disparities by taking
19       differences in income, loan amounts, and other borrower-
20       specific HMDA information into consideration, but was
21       not able to fully explain the differentials between racial
22       groups. Numerous studies conducted by other
23       organizations since then were also unable to fully account
24       for the pricing disparities using data on borrower
25       creditworthiness and other factors.
26
27       Last month an updated Federal Reserve study was
28       released using 2005 HMDA data that again revealed that

5

1    Hispanic whites and African Americans are significantly
2    more likely to receive higher priced loans than non-
3    Hispanic Whites.  Relative to the earlier Federal Reserve
4    study, it revealed a significant increase in the incidence of
5    high priced loans as well as significantly larger disparities
6    in the proportion of minorities receiving high-priced loans
7    compared to non-Hispanic Whites.  <u>The study found that</u>
8    <u>the incidence of higher priced conventional home</u>
9    <u>purchase loans was 54.7 percent for blacks and 46.1</u>
10   <u>percent for Hispanic whites compared to 17.2 percent for</u>
11   <u>non-Hispanic whites.  The researchers attempted to</u>
12   <u>control for borrower-related factors but found that such</u>
13   <u>factors accounted for only one-fifth of these differences.</u>
14   This evidence of even greater disparities in the incidence
15   of high-priced loans across racial groups contained in the
16   2005 data further heightens concerns about lending
17   practices and the pricing of credit.  (emphasis added;
18   footnotes omitted).

19       18.    Thus, for 2005, the HMDA data shows that "for conventional home-
20   purchase loans, the gross mean incidence of higher-priced lending was 54.7
21   percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5
22   percentage points."  *Id.* at A159.  The situation is similar for refinancings, where
23   there is a difference of 28.3 percentage points between blacks and non-Hispanic
24   whites.  Avery, Brevoort, and Canner, Federal Reserve Bulletin, A124, A159.

25       19.    In addition, the Association of Community Organizations for Reform
26   Now ("ACORN") released a report entitled "The High Cost of Credit: Disparities
27   in High-priced Refinanced Loans to Minority Homeowners in 125 American
28   Cities," dated September 27, 2005, which found that "[i]n every metropolitan area

6

1   where at least 50 refinances were made to African-American homeowners,

2   African-Americans were more likely to receive a high-cost loan than White

3   homeowners."

4   B.    Wells Fargo's Discriminatory Lending Policies

5           1.    The Loan Officers, Mortgage Brokers and Correspondent

6                  Lenders Act For and at the Direction of Wells Fargo

7        20.    Through loan officers, brokers and a network of correspondent

8   lenders, Wells Fargo originates and funds mortgage loans. These loan officers,

9   mortgage brokers and correspondent lenders work with Wells Fargo to broker and

10  fund loans to borrowers under the direction of Wells Fargo and in conformance

11  with Wells Fargo's credit-pricing policies and lending procedures. Indeed, Wells

12  Fargo stated on its website that "mortgage broker[s] . . ." match borrowers with

13  lenders. (https://www.wellsfargo.com/mortgage/glossary/m) (last viewed October

14  11, 2007). According to Wells Fargo's website, these correspondent lenders

15  "originate, underwrite, and close loans before sending them to Wells Fargo . . ."

16  (https://www.wellsfargo.com/com/third_party_mortgage/) (last viewed October 11,

17  2007).)

18       21.    Authorized mortgage brokers act as the agents of Wells Fargo in

19  originating mortgage loans and Wells Fargo discriminates through its authorized

20  mortgage brokers.

21       22.    These authorized mortgage brokers enter into agreements with Wells

22  Fargo to accept loan applications on behalf of Wells Fargo. They also

23  communicate to the loan applicants the financing terms and rates set by Wells

24  Fargo and inform the loan applicants of the various financing options of Wells

25  Fargo. Ultimately, the authorized mortgage brokers originate mortgage loans

26  funded by Wells Fargo using the paperwork supplied by Wells Fargo and in strict

27  accordance with Wells Fargo's policies and procedures.

28       23.    The authorized correspondent lenders and loan officers of Wells

7

1 | Fargo act as the agents of Wells Fargo in originating loans. These correspondent
2 | mortgage lenders and loan officers of Wells Fargo act in accordance with Wells
3 | Fargo's credit policies and procedures. Wells Fargo funds these loans before or
4 | shortly after these loans with the borrowers close.

5 |     24.    Wells Fargo funds loans originated by its loan officers, authorized
6 | mortgage brokers and correspondent lenders, establishes the terms and conditions
7 | respecting these loans, and absorbs part or all of the risk on these loans. Wells
8 | Fargo actively and intentionally enforces and encourages its lending policies
9 | through its authorized loan officers, mortgage brokers and correspondent lenders.

10 |     25.    Thus, Wells Fargo provides to its loan officers, correspondent lenders
11 | and mortgage brokers with loan-related forms and agreements, including loan
12 | contracts, loan applications, and instructions for completing loan applications and
13 | contracts. In addition, Wells Fargo instructs and directs its authorized brokers to
14 | follow policies and procedures of Wells Fargo and encourages that training with
15 | marketing support and policies.

16 |     2.    Through Training and Financial Incentives, Wells Fargo
17 |         Fosters and Encourages Discretionary Charges to Minorities

18 |     26.    At all relevant times, Wells Fargo employed discretionary loan pricing
19 | procedures that cause minority borrowers to pay subjective and additional fees
20 | such as yield spread premiums and other mortgage-related finance charges at
21 | higher rates than similarly situated non-minority borrowers. In doing so, Wells
22 | Fargo has intentionally discriminated against Plaintiffs and Members of the Class
23 | by systematically extending mortgage loans to minorities with less favorable
24 | conditions than were given to similarly situated non-minority borrowers. This
25 | pattern of discrimination is not the result of random or non-discriminatory factors.
26 | The discrimination is a direct result of the mortgage credit lending policies and
27 | procedures of Wells Fargo.

28 |     27.    Wells Fargo authorized its loan officers, mortgage brokers and

8

1  correspondent lenders to receive their compensation from Wells Fargo based on
2  the rate of interest on a loan charged to the borrower.  Loan officers, authorized
3  brokers and correspondent lenders of Wells Fargo receive more compensation
4  from Wells Fargo when they sell their clients loans of Wells Fargo with higher
5  interest rates and less compensation from Wells Fargo when their clients obtain
6  loans from Wells Fargo with lower interest rates.

7      28.    In several important ways, Wells Fargo intentionally and actively
8  implements this discriminatory loan pricing procedure.

9      29.    Wells Fargo instructs and educates its loan officers and brokers in
10  Wells Fargo's credit policies and procedures.  Wells Fargo conducts weekly
11  "training" sessions online (*i.e.*, interactive Internet seminars) for its brokers
12  concerning its loan products where it disseminates to brokers "detailed information
13  on [Wells Fargo's] product guidelines[.]"  (https:// ilnet.wellsfargo.com/ildocs
14  /ee/training.html (last viewed on October 11, 2007).)

15      30.    Further, Wells Fargo also maintains an Internet site called "Broker's
16  First" that supplies brokers with rate sheets, a "Broker Guide," and underwriting
17  guidelines.

18      31.    In addition, Wells Fargo instructs its loan officers and brokers in
19  marketing Wells Fargo's loans.  For example, Wells Fargo provides its authorized
20  brokers downloadable mortgage advertisements.  (https://ilnet.wellsfargo.com
21  /ildocs/ee/marketing_tools.html (last viewed on October 11, 2007).)

22      32.    The loan pricing policies and procedures of Wells Fargo permit its
23  authorized loan officers, mortgage brokers and correspondent lenders to charge at
24  their discretion certain loan applicants including minority loan applicants, yield
25  spread premiums and other additional discretionary charges.

26      33.    This pattern of discrimination of Wells Fargo cannot be justified by
27  business necessity, and the discrimination could be avoided through the use of
28  alternative policies and procedures that have less discriminatory impact and no less

1 business efficacy.

2         3.    Wells Fargo's Practice of Discretionary and Subjective
3              Additional Charges Are Designed to Discriminate Against
4              Minorities

5     34.    When a mortgage loan applicant has provided credit information to
6 Wells Fargo through a loan officer, mortgage broker or correspondent lender,
7 Wells Fargo performs an objective credit analysis. To do so, Wells Fargo
8 evaluates numerous risk-related credit variables, such as debt-to-income ratios,
9 credit bureau histories, debt ratios, loan-to-value ratios, bankruptcies, automobile
10 repossessions, prior foreclosures, payment histories, credit scores, and similar
11 objective criteria.

12     35.    From these factors, Wells Fargo develops a risk-based financing rate.
13 Wells Fargo and the mortgage industry in general refer to this risk-based financing
14 rate as the "par rate." The brokers and correspondent lenders of Wells Fargo can
15 also estimate the "par rates" with reference to a loan applicant's credit bureau-
16 determined credit score.

17     36.    Wells Fargo applies objective criteria to calculate this risk-related
18 interest rate. However, as part of its established procedures, Wells Fargo
19 authorizes its loan officers, brokers and correspondent lenders to subsequently
20 increase that rate and, in addition, impose additional non-risk-based charges
21 including yield spread premiums, and other discretionary fees. As a matter of
22 course, Wells Fargo routinely communicates applicable par rates, authorized yield
23 spread premiums, and other discretionary fees to its loan officers, brokers and
24 correspondent lenders through "rate sheets" and other established communications
25 and directives.

26     37.    As a matter of policy, Wells Fargo grants its loan officers, authorized
27 mortgage brokers and correspondent lenders the discretion to impose yield spread
28 premiums and other additional subjective fees on borrowers. When borrowers pay

10

1    yield spread premiums, Wells Fargo shares in additional income generated by the

2    increased cost because borrower with the yield spread premium is required to pay a

3    higher rate in the future on their loan than they would have paid if they had been

4    placed in a par rate loan without a yield spread premium.

5          38.    The borrowers of Wells Fargo pay yield spread premiums and other

6    discretionary fees that inflate their finance charges not knowing that a portion of

7    their finance charges are non-risk-related.

8          39.    The policies and procedures of Wells Fargo concerning the

9    assessment of yield spread premiums and other discretionary fees cause persons

10    with identical or similar credit scores to pay differing amounts for obtaining the

11    same loan. Such subjective loan pricing–which by design imposes differing

12    finance charges on persons with the same or similar credit profiles–disparately

13    impacts minorities who obtain loans from Wells Fargo.

14          40.    Relative to similarly situated non-minorities, Wells Fargo's use of

15    yield spread premiums and other discretionary fees disproportionately and

16    adversely affects minorities. The credit policy of Wells Fargo causes minorities to

17    pay disparately more discretionary finance charges than similarly situated non-

18    minorities. As the HMDA data referenced above confirms, minorities are

19    substantially more likely than similarly situated non-minorities to pay such

20    increased charges.

21          41.    The credit policy of Wells Fargo is in fact intentionally

22    discriminatory.

23    C.    <u>As Part of Its Pattern of Discrimination, Wells Fargo Imposed</u>

24          <u>Discriminatory Fees on Plaintiffs</u>

25          42.    The discriminatory credit pricing policy of Wells Fargo directly

26    impacted and damaged the Plaintiffs. With a closing date of August 1, 2006,

27    Plaintiffs purchased a residence with a mortgage loan issued by Wells Fargo in the

28    amount of $620,500. Schaefer Financial Services ("Schaefer") was the mortgage

1 | loan broker with respect to the loan of Plaintiffs obtained from Wells Fargo.

2 |      43.    According to their HUD-I closing statement, at the closing of the loan,

3 | Plaintiffs were subjected to a charge described as "Mortgage Broker Compensation

4 | By WFB To:  SCHAEFER FINANCIAL SERVICE" in the amount of $6,205.00

5 | on a "POC" basis (*i.e.*, paid outside of closing) by Wells Fargo.  A true and correct

6 | copy of the HUD-I closing statement is attached hereto as Exhibit "A."  On

7 | information and belief, this "compensation" to Schaefer, was in fact a yield spread

8 | premium. This yield spread premium was assessed pursuant to Wells Fargo's

9 | credit loan pricing policy as alleged in this Complaint.

10 |      44.    At all relevant times, Schaefer and Wells Fargo knew that Plaintiffs

11 | were minority borrowers.  The Schaefer employee who brokered Plaintiffs' Wells

12 | Fargo loan in conformance with Wells Fargo's discriminatory credit pricing policy

13 | was aware that Plaintiffs are Latinos when arranging the loan to Plaintiffs from

14 | Wells Fargo.

15 |      45.    As a result of Wells Fargo's discriminatory conduct, Plaintiffs

16 | received a loan with more expensive terms and higher costs than similarly situated

17 | non-minority borrowers of Wells Fargo.

18 | CLASS ALLEGATIONS

19 |      46.    This class action is brought in accordance with the to ECOA, the FHA

20 | and the Civil Rights Act by Plaintiffs on behalf of themselves and all minority

21 | borrowers (the "Class") who entered into residential mortgage loan contracts that

22 | were financed or purchased by Wells Fargo, and who were harmed by the

23 | discriminatory conduct of Wells Fargo.

24 |      47.    Plaintiffs sue on their own behalf, and on behalf of a class of similarly

25 | situated persons in accordance with Rule 23(a) and (b)(2) and/or (b)(3) of the

26 | Federal Rules of Civil Procedure.

27 |      48.    Plaintiffs do not know the exact number of persons in the Class or

28 | identities of the Members of the Class, because that information is in the exclusive

12

1  control of Wells Fargo.  Plaintiffs believe that the Class includes many thousands,
2  or tens of thousands of individuals, who are geographically dispersed throughout
3  the United States.  Therefore, the Class is so numerous that joinder of all members
4  is impracticable.

5    49.    All Members of the Class have been subjected to and impacted by
6  Wells Fargo's practice of assessing yield spread premiums and other discretionary
7  fees on mortgage loans.  There are questions of law and fact that are common to
8  the Class, and that predominate over any questions affecting only individual
9  Members of the Class.  These common issues include, but, are not limited to, the
10 following:

11    a.    the nature and scope of Wells Fargo's policies and procedures
12          concerning discretionary mortgage loan fees;
13    b.    whether Wells Fargo used a scheme or common course of conduct
14          that acted to deceive Plaintiffs and Member of the Class;
15    c.    whether Wells Fargo discriminated against Plaintiffs and Members of
16          the Class by charging them higher interest, fees, and costs, than Wells
17          Fargo charges similarly situated non-minority borrowers;
18    d.    whether Wells Fargo policies and procedures regarding other
19          discretionary mortgage loan-related fees have a disparate impact on
20          minority borrowers;
21    e.    whether Wells Fargo has any legitimate non-discriminatory reason for
22          its policies and procedures;
23    f.    whether Wells Fargo's mortgage credit-pricing policies and
24          procedures are racially motivated;
25    g.    whether Wells Fargo and its subsidiaries participate in decisions
26          concerning whether or not to extend credit to consumers (and thus are
27          creditors under ECOA);
28    h.    whether Wells Fargo has a less discriminatory alternative to these

13

1  policies and procedures;

2      i.    whether the Court should enter declaratory and injunctive relief; and

3      j.    the proper measure of disgorgement and/or monetary relief for

4      Plaintiffs and Members of the Class.

5      50.    Plaintiffs' claims are typical of the claims of the Class, and do not

6  conflict with the interests of any Members of the Class in that both Plaintiffs, and

7  the Members of the Class, were subjected to the same yield spread premiums and

8  other discretionary fees that have disproportionately affected minority borrowers.

9      51.    Plaintiffs will fairly and adequately represent the interests of the

10  Class. Plaintiffs are committed to vigorous prosecution of the claims of the Class,

11  and have retained attorneys who have extensive experience in consumer protection

12  and credit discrimination actions.

13      52.    Wells Fargo has acted or refused to act on grounds generally

14  applicable to the Class, thereby making appropriate final injunctive relief or

15  corresponding declaratory relief with respect to the class as a whole.

16      53.    A class action is superior to other methods for the speedy and efficient

17  adjudication of this controversy. A class action regarding the issues as alleged in

18  this action does not create any problems of manageability.

19                  FRAUDULENT CONCEALMENT, CONTINUING

20            VIOLATIONS AND EQUITABLE TOLLING OF CLAIMS

21      54.    Plaintiffs and Members of the Class did not know, and could not

22  reasonably have known, that they would receive from mortgage loans Wells Fargo

23  with more burdensome terms and higher costs and fees than non-minorities.

24  Therefore, the claims of Plaintiffs and Members of the Class did not accrue until

25  shortly before the filing of this action.

26      55.    The discriminatory conduct of Wells Fargo was concealed. Wells

27  Fargo knew that Plaintiffs and Members of the Class did not know the terms, fees,

28  and costs of their loans relative to those available to non-minorities. Wells Fargo

14

1 knew that the terms, fees, and costs provided to minorities were substantially more
2 burdensome and expensive than the loans provided to non-minorities and Wells
3 Fargo knew that these minorities did not know these facts.

4      56.    Wells Fargo has not released or provided information about its
5 discrimination against Plaintiffs and Members of the Class, and Wells Fargo has
6 actively and fraudulently concealed its discriminatory practices and policies.

7      57.    Accordingly, Plaintiffs and Members of the Class in the exercise of
8 due diligence could not have reasonably discovered the discriminatory practices,
9 and they did not do so until just recently. Thus, the Members of the Class still do
10 not know that they have been and continue to be injured by Wells Fargo's
11 discriminatory conduct.

12      58.    The discriminatory conduct of Wells Fargo is continuing in nature,
13 and, at all times relevant, Wells Fargo has committed discriminatory acts
14 throughout the limitations period.

15      59.    There is a substantial connection between the acts of discrimination
16 occurring within the limitation periods prior to the filing of this action, and the acts
17 of discrimination before that time. The acts involve the same type of
18 discrimination and are recurring, not isolated events.

19      60.    Wells Fargo specifically misled Plaintiffs and Members of the Class
20 into believing that the mortgage-related terms, fees, and costs they were offered
21 were fair, reasonable, and the same as offered to non-minorities, and Wells Fargo
22 took steps to conceal its fraudulent and unfair conduct.

23      61.    The statute of limitations applicable to any claims that Plaintiffs or
24 other Members of the Class have brought or could bring as a result of the unlawful
25 and fraudulent concealment and course of conduct described herein, have been
26 tolled as a result of Wells Fargo's fraudulent concealment. In addition, Plaintiffs
27 and the Class did not and could not have discovered their causes of action until the
28 time alleged below, thereby tolling any applicable statute of limitations.

1                <u>FIRST CAUSE OF ACTION</u>

2            (Violation of the Equal Credit Opportunity Act

3                 (15 U.S.C. §§1691-1691f)

4       62.     Plaintiffs refer to the prior paragraphs of this Complaint and

5 incorporate those paragraphs as though set forth in full in this cause of action.

6       63.     Wells Fargo engages in credit transactions through its offering,

7 granting, and purchasing of residential home mortgage loans.

8       64.     By imposing higher interest rates and other discretionary fees on

9 residential home mortgage loans to Plaintiffs and Members of the Class than it

10 imposed on non-minority mortgage borrowers, Wells Fargo has discriminated

11 against Plaintiffs and Members of the Class with respect to a credit transaction on

12 the basis of race in violation of the ECOA. 15 U.S.C. section 1691(a).

13       65.     In addition, Wells Fargo's pricing policies and procedures (including

14 yield spread premiums), which provide financial incentives to its mortgage brokers

15 and correspondent lenders to make subjective decisions to increase interest rates

16 and charge additional fees and costs, have a disparate impact on Plaintiffs and

17 Members of the Class.

18       66.     As a proximate result of Wells Fargo's violation of 15 U.S.C. section

19 1691, Plaintiffs and Members of the Class have been injured and are entitled to

20 injunctive and declaratory relief and damages, or make whole equitable relief.

21       67.     In addition, Wells Fargo's conduct as alleged herein was intentional,

22 willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond

23 mere negligence. Wells Fargo acted with malice and reckless indifference to the

24 federally protected rights of Plaintiffs and Members of the Class. As a result,

25 Plaintiffs and Members of the Class are entitled to punitive damages.

26       68.     Moreover, Wells Fargo continues to discriminate in violation of the

27 ECOA against Members of the Class every time Wells Fargo provides a residential

28 home mortgage loan as described herein. If not enjoined from such violation by

1  the Court, Wells Fargo will continue to engage in conduct that disregards the rights

2  of Plaintiffs and Members of the Class, and cause Plaintiffs and Members of the

3  Class irreparable injury for which there is no adequate remedy at law.  15 U.S.C.

4  section 1691(e).

5       69.    Plaintiffs and Members of the Class respectfully request that this

6  Court to declare the rights of the parties herein regarding Wells Fargo's obligation

7  to participate in credit transactions without discriminating against applicants for

8  credit on the basis of the applicants' race.

9                          SECOND CAUSE OF ACTION

10                    (Racial Discrimination (42 U.S.C. §1981))

11      70.    Plaintiffs refer to the prior paragraphs of this Complaint and

12  incorporate those paragraphs as though set forth in full in this cause of action.

13      71.    Wells Fargo intentionally discriminated against Plaintiffs and

14  Members of the Class by charging higher interest rates and other fees and costs

15  than were charged to similarly situated non-minority borrowers.

16      72.    Wells Fargo unlawfully discriminated against Plaintiffs and Members

17  of the Class in (i) formation of contracts; (ii) making, performance, modification,

18  and termination of contracts; (iii) the enjoyment of all benefits, privileges, terms

19  and conditions of the contractual relationship; and/or (iv) conduct that interferes

20  with the right to establish and enforce contract obligations.

21      73.    Wells Fargo's actions violate 42 U.S.C. section 1981, as well as the

22  rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth

23  Amendments to the Constitution of the United States.

24      74.    Plaintiffs and Members of the Class are entitled to injunctive and

25  declaratory relief and damages, or make whole equitable relief as a result of Wells

26  Fargo's discriminatory conduct.

27      75.    At no time has Wells Fargo undertaken corrective action to ameliorate

28  its racially discriminatory practices.  Wells Fargo continues to reap the profits of

17

1 its discriminatory practices and continues to discriminate. Wells Fargo's conduct

2 as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous,

3 or otherwise aggravated beyond mere negligence. Wells Fargo has acted with

4 malice and reckless indifference to the federally protected rights of Plaintiffs and

5 Members of the Class. As a result, Plaintiffs and Members of the Class are entitled

6 to punitive damages.

### THIRD CAUSE OF ACTION

(Racial Discrimination (42 U.S.C. §1982))

9    76.    Plaintiffs refer to the prior paragraphs of this Complaint and

10 incorporate those paragraphs as though set forth in full in this cause of action.

11    77.    42 U.S.C. section 1982 provides that all citizens of the United States

12 "shall have the same right, in every State and Territory, as is enjoyed by White

13 citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal

14 property."

15    78.    Wells Fargo has discriminated against Plaintiffs and the Class with

16 respect to their mortgage loans for their homes by charging Plaintiffs and the Class

17 higher interest rates and other discretionary fees than Wells Fargo has charged

18 similarly situated non-minority consumers. As a result of Wells Fargo's conduct,

19 Plaintiffs and the Class have not had the same right as Caucasians to inherit,

20 purchase, sell, hold, and convey real property. Wells Fargo has thereby violated 42

21 U.S.C. section 1982.

22    79.    Wells Fargo's violation of 42 U.S.C. section 1982 was intentional and

23 malicious.

24    80.    As a proximate result of Wells Fargo's violation of 42 U.S.C. section

25 1982, Plaintiffs and Members of the Class have been injured, and are entitled to

26 injunctive and declaratory relief and damages, or make whole equitable relief. In

27 addition, Wells Fargo's conduct as alleged herein was intentional, willful, wanton,

28 reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence.

18

1  Wells Fargo acted with malice and reckless indifference to the federally protected

2  rights of Plaintiffs and Members of the Class. As a result, Plaintiffs and Members

3  of the Class are entitled to punitive damages.

4  FOURTH CAUSE OF ACTION

5  (Violation of the Fair Housing Act (42 U.S.C. §§3601-3619))

6      81.    Plaintiffs refer to the prior paragraphs of this Complaint and

7  incorporate those paragraphs as though set forth in full in this cause of action.

8      82.    Mortgage lending and the providing of residential mortgage loans is a

9  "residential real estate-related transaction" within the meaning of the FHA. 42

10  U.S.C. section 3605(b).

11      83.    By imposing higher interest rates and other discretionary fees on

12  residential home mortgage loans to Plaintiffs and Members of the Class than it

13  imposed on non-minority mortgage borrowers, Wells Fargo has discriminated

14  against Plaintiffs and Members of the Class concerning their ability to participate

15  in real estate-related transactions, and in the terms and conditions of such

16  transactions, in violation of the FHA. 42 U.S.C. section 3605(a).

17      84.    In addition, Wells Fargo's pricing policies and procedures (including

18  yield spread premiums), which provide financial incentives to its mortgage brokers

19  and correspondent lenders to make subjective decisions to increase interest rates

20  and charge additional fees and costs, had a disparate impact upon Plaintiffs and

21  Members of the Class.

22      85.    As a proximate result of Wells Fargo's violation of 42 U.S.C. section

23  3605, Plaintiffs and Members of the Class have been injured and are entitled to

24  injunctive and declaratory relief and damages, or make whole equitable relief.

25      86.    In addition, Wells Fargo's conduct as alleged herein was intentional,

26  willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond

27  mere negligence. Wells Fargo acted with malice and reckless indifference to the

28  federally protected rights of Plaintiffs and Members of the Class. Accordingly,

19

1  Plaintiffs and Members of the Class are entitled to punitive damages.

2       87.    Moreover, Wells Fargo continues to discriminate in violation of the

3  FHA against Members of the Class every time Wells Fargo provides a home

4  mortgage loan as described in this Complaint. If not enjoined from such violation

5  by the Court, Wells Fargo will continue to engage in conduct that disregards the

6  rights of Plaintiffs and Members of the Class, and cause Plaintiffs and Members of

7  the Class irreparable injury for which there is no adequate remedy at law. 42

8  U.S.C. section 3613(c).

9       88.    Plaintiffs and Members of the Class respectfully request this Court to

10  declare the rights of the parties herein regarding Wells Fargo's obligation to

11  participate in credit transactions without discriminating against applicants for

12  credit on the basis of the applicants' race.

13       WHEREFORE, Plaintiffs and Members of the Class respectfully pray for

14  judgment as follows:

15  A.    An order determining that the action is a proper class action pursuant

16        to Rule 23 of the Federal Rules of Civil Procedure;

17  B.    A Judgment granting extraordinary equitable and/or injunctive relief

18        as permitted by law or equity, including rescission, restitution,

19        reformation, attaching, impounding, or imposing a constructive trust

20        upon, or otherwise restricting, the proceeds of Defendant's ill-gotten

21        funds to ensure that Plaintiffs and Members of the Class have an

22        effective remedy;

23  C.    A Judgment awarding damages, including punitive damages, in favor

24        of Plaintiffs and Members of the Class;

25  D.    A Judgment granting declaratory and injunctive relief and all relief

26        that flows from such injunctive and declaratory relief;

27  E.    A Judgment awarding Plaintiffs and Members of the Class costs and

28        disbursements incurred in connection with this action, including

20

1   reasonable attorneys' fees, expert witness fees and other costs; and

2   F.   A Judgment or other Order granting such other and further relief as

3        the Court deems just and proper including, but not limited to,

4        recessionary relief and reformation.

5

6   Dated:  October 18, 2007          LAW OFFICES OF TIMOTHY P. DILLON

7

8                                     By:_____

9                                        Timothy P. Dillon
                                         Attorneys for Plaintiffs
10                                       Juan Rodriguez and Josefina Rodriguez

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

1

## DEMAND FOR JURY TRIAL

2

3    Plaintiffs demand a trial by jury on all issues so triable by jury.

4

5   Dated:  October 18, 2007          LAW OFFICES OF TIMOTHY P. DILLON

6

7                                     By:_____

8                                          Timothy P. Dillon
                                        Attorneys for Plaintiffs
9                                       Juan Rodriguez and Josefina Rodriguez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Greenleaf Escrow, Inc.

6528 Greenleaf Ave., Ste. 100
Whittier, CA 90601
Phone: (562) 309-0028 • Fax: (562) 693-0342

### BUYER/BORROWER STATEMENT
Final

| | | Title Order Number: | 600005346 |
| --- | --- | --- | --- |
| ...umber: | 06-053-SH | Date: | 04/19/2007 – 1:02:54PM |
| ...ow Officer: | Sonya Harrell | Closing Date: | 08/01/2006 |

Buyer/Borrower: Juan Rodriguez and Josefina Rodriguez

Seller: UNIVERSAL DEVEOPMENT, INC., A CALIFORNIA CORPORATION

Property: 947 W. 80th St., Los Angeles, CA 90044

| | DEBITS | CREDITS |
| --- | --- | --- |
| **TOTAL CONSIDERATION** | 730,000.00 | |
| Initial Deposit | | 10,000.00 |
| Initial Deposit | | 101,863.04 |
| **PRORATIONS/ADJUSTMENTS:** | | |
| Property Tax @ 2,395.19 per 6 month(s) 7/01/2006 to 8/01/2006 | | 399.20 |
| Seller credit to Borrower(2%) | | 14,600.00 |
| **COMMISSION(S):** | | |
| Debits to Commission | | 2,500.00 |
| **TITLE CHARGES** | | |
| Lender/Mortgage Premium for 620,500.00: SECURITY UNION TITLE COMPANY. | 672.00 | |
| Deed Recording Fee (2): SECURITY UNION TITLE COMPANY. | 12.00 | |
| Mortgage Recording Fee: SECURITY UNION TITLE COMPANY. | 89.00 | |
| Endorsement: SECURITY UNION TITLE COMPANY. | 50.00 | |
| Wire/Express: SECURITY UNION TITLE COMPANY. | 11.50 | |
| Subescrow: SECURITY UNION TITLE COMPANY. | 37.50 | |
| special messenger: SECURITY UNION TITLE COMPANY. | 21.85 | |
| **ESCROW CHARGES TO: Greenleaf Escrow, Inc.** | | |
| Escrow Fee | 1,295.00 | |
| Doc/Copy/Pkg | 150.00 | |
| Loan Tie In | 75.00 | |
| Courier | 75.00 | |
| Wire Fee | 50.00 | |
| **LENDER CHARGES** | | |
| New to WELLS FARGO BANK: | | 620,500.00 |
| Interest Adjustment From 7/31/2006 To 8/01/2006, 1 Days, @ 157.2500/per day: WELLS FARGO BANK | 157.25 | |
| Underwriting Fee: WELLS FARGO BANK | 695.00 | |
| Appraisal Review: WELLS FARGO BANK | 135.00 | |
| Tax Registration: WELLS FARGO BANK | 85.00 | |
| Flood Determination: WELLS FARGO BANK | 19.00 | |
| Processing Fee: SCHAEFER FINANCIAL SERVICE | 595.00 | |
| Origination Fee: SCHAEFER FINANCIAL SERVICE | 12,410.00 | |
| Mortgage Broker Compensation By WFB: SCHAEFER FINANCIAL SERVICE POC $6,205.00 | | |
| **ADDITIONAL DISBURSEMENTS:** | | |
| Notary Fee: REBECCA GARCIA | 200.00 | |
| Hazard Insurance: Oscar Jimenez Insurance Agency | 1,056.06 | |
| BALANCE DUE YOU | 1,971.08 | |
| **TOTALS** | 749,862.24 | 749,862.24 |

THIS IS A FINAL CLOSING STATEMENT

EXHIBIT A, PAGE 23

OMB No. 2502-0265

| A. U.S. DEPARTMENT OF HOU___ AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. ___PE___ OF___ LOAN |
|---|---|

| B. TYPE OF LOAN | |
|---|---|
| 1. ☐ FHA | 2. ☐ FMHA | 3. ☒ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. FILE NUMBER: 06-053-SH    7. LOAN NUMBER: 0152728026

8. MORTGAGE INS. CASE NO.:

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown here. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME & ADDRESS OF BORROWER: Juan Rodriguez and Josefina Rodriguez
947 W. 80th St., Los Angeles, CA 90044

E. NAME & ADDRESS OF SELLER: UNIVERSAL DEVELOPMENT, INC., A CALIFORNIA CORPORATION

F. NAME & ADDRESS OF LENDER: WELLS FARGO BANK
711 W. BROADWAY ROAD, Tempe, AZ 85282

G. PROPERTY LOCATION: 947 W. 80th St., Los Angeles, CA 90044

H. SETTLEMENT AGENT: Greenleaf Escrow, Inc.
PLACE OF SETTLEMENT: 6528 Greenleaf Ave., Ste. 100, Whittier, CA 90601 (562) 309-0028

I. SETTLEMENT DATE: 8/01/2006  Final

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | 400. Gross Amount Due To Seller: | |
| 101. Contract sales price | 730,000.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 17,891.16 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| | | | |
| | | | |
| | | | |
| Adjustments For Items Paid By Seller In Advance: | | Adjustments For Items Paid By Seller In Advance: | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 120. Gross Amount Due From Borrower: | 747,891.16 | 420. Gross Amount Due To Seller: | |
| 200. Amounts Paid By Or In Behalf Of Borrower: | | 500. Reductions In Amount Due Seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 620,500.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Debits to Commission | 2,500.00 | 504. Payoff 1st Mtg. Ln. | |
| 205. Initial Deposit To Escrow | 101,863.24 | 505. Payoff 2nd Mtg. Ln. | |
| 206. Initial Deposit To Escrow | 10,000.00 | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| | | | |
| | | | |
| Adjustments For Items Unpaid By Seller: | | Adjustments For Items Unpaid By Seller: | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes    07/01/06 to 08/01/06 | 399.20 | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. Seller credit to Borrower(2%6) | 14,600.00 | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower: | 749,862.24 | 520. Total Reductions In Amount Due Seller: | |
| 300. Cash At Settlement From/To Borrower: | | 600. Cash At Settlement From/To Seller: | |
| 301. Gross amount due from borrower (line 120) | 747,891.16 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 749,862.24 | 602. Less reductions in amount due seller (line 520) | |
| 303. Cash (☐FROM) (☒TO) Borrower: | 1,971.08 | 603. Cash (☐TO) (☐FROM) Seller: | 0.00 |

Previous Edition Is Obsolete
Form No. 1581
1/86

SD-4-3538-000-1
HUD-1 (3-86)
RESPA, HB 4305.2

EXHIBIT A,  PAGE 24

| | SETTLEMENT CHARGES | Escrow: 06-053-SH | | |
|---|---|---|---|---|
| 700. Total Sales/Broker's Comm Based On Price | n: 730,000.00 @ 5.00 % = 36,500.00 | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
| Division of Commission (line 700) As Follows: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| 800. Items Payable In Connection With Loan: | | | | |
| 801. Loan Origination fee  2.0000 | % SCHAEFER FINANCIAL SERVICE 2% Origination fee to Bro | | 12,410.00 | |
| 802. Loan Discount | % | | | |
| 803. Appraisal fee to: | | | | |
| 804. Credit report to: | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. Tax Registration To: WELLS FARGO BANK | | | 85.00 | |
| 809. Flood Determination To: WELLS FARGO BANK | | | 19.00 | |
| 810. Processing Fee To: SCHAEFER FINANCIAL SERVICE | | | 595.00 | |
| 811. Mortgage Broker Compensation By WPB To: SCHAEFER FINANCIAL SERVICE POC    $6,205.00 | | | | |
| 812. Underwriting Fee To: WELLS FARGO BANK | | | 695.00 | |
| 813. Appraisal Review To: WELLS FARGO BANK | | | 135.00 | |
| 814. | | | | |
| 815. | | | | |
| 816. | | | | |
| 900. Items Required By Lender To Be Paid In Advance: | | | | |
| 901. Interest from  7/31/2006  to  8/01/2006  @$  157.2500/day  (1 days) | | | 157.25 | |
| 902. Mortgage insurance premium for  mo. to | | | | |
| 903. Hazard insurance premium for  yrs. to | | | | |
| 904. Flood Insurance premium for  yrs. to | | | | |
| 905. | | | | |
| 906. | | | | |
| 1000. Reserves Deposited With Lender: | | | | |
| 1001. Hazard insurance  months @ $  per month | | | | |
| 1002. Mortgage insurance  months @ $  per month | | | | |
| 1003. City property taxes  months @ $  per month | | | | |
| 1004. County property taxes  months @ $  per month | | | | |
| 1005. Annual assessments  months @ $  per month | | | | |
| 1006. Flood insurance  months @ $  per month | | | | |
| 1007.  months @ $  per month | | | | |
| 1008. Aggregate Adjustment | | | | |
| 1009. | | | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee to Greenleaf Escrow, Inc. | | | 1,295.00 | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary Fees to | | | | |
| 1107. Attorney's fees to | | | | |
|  (includes above item Numbers: | ) | | | |
| 1108. Title insurance to SECURITY UNION TITLE COMPANY | | | | |
|  (includes above item Numbers: | ) | | 672.00 | |
| 1109. Lender's coverage  $ 620,500.00 Premium  $672.00 | | | | |
| 1110. Owner's coverage  $ | | | | |
| 1111. Deed Recording Fee (2) to SECURITY UNION TITLE COMPANY | | | 12.00 | |
| 1112. Endorsement to SECURITY UNION TITLE COMPANY | | | 50.00 | |
| 1113. Wire/Express to SECURITY UNION TITLE COMPANY | | | 11.50 | |
| 1114. Exhibit "A" Attached Hereto | | | 409.35 | |
| 1200. Government Recording and Transfer Charges: | | | | |
| 1201. Recording fees: Deed $  ;Mortgage $  89.00  ;Releases $ | | | 89.00 | |
| 1202. City/county tax/stamps: Deed $  ;Mortgage $ | | | | |
| 1203. State tax/Stamps:  Deed $  ;Mortgage $ | | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1300. Additional Settlement Charges: | | | | |
| 1301. Survey to | | | | |
| 1302. Pest inspection to | | | | |
| 1303. Notary Fee to REBECCA GARCIA | | | 200.00 | |
| 1304. Hazard Insurance to Oscar Jimenez Insurance Agency | | | 1,056.06 | |
| 1305. | | | | |
| 1306. | | | | |
| 1307. | | | | |
| 1308. | | | | |
| 1309. | | | | |
| 1310. | | | | |
| 1311. | | | | |
| 1312. | | | | |
| 1313. | | | | |
| 1400.  Total Settlement Charges  (Enter on line 103, Section J and line 502, Section K) | | | 17,891.16 | |

Form no. 1582    (323) 315 5166 FAX    Page 2 of 2    SB-4-3535-000.1

(323) 855 9479 (ACE MORTGAGE)

EXHIBIT A, PAGE 25

| ATTACHMENT TO HUD 1 | | Escrow No.: | 06-053-SH |
|---|---|---|---|
| Settlement Date: 8/01/2006 | | Title No.: | 600005346 |
| | | Page: | 1 |

EXHIBIT A: (HUD Section 1100)
Title Charges:

| | Buyer Amount |
|---|---|
| Subescrow to SECURITY UNION TITLE COMPANY. | 37.50 |
| special messenger to SECURITY UNION TITLE COMPANY. | 21.85 |
| Doc/Copy/Pkg to Greenleaf Escrow, Inc. | 150.00 |
| Loan Tie In to Greenleaf Escrow, Inc. | 75.00 |
| Courier to Greenleaf Escrow, Inc. | 75.00 |
| Wire Fee to Greenleaf Escrow, Inc. | 50.00 |
| Total: | 409.35 |

EXHIBIT A, PAGE 26